UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:20 CR 104 SNLJ (ACL) |
| | ) | |
| DANEQUAY SMITH, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

This matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b).  Pending before the undersigned is Defendant Danequay Smith's Motion to Suppress Physical Evidence and Statements.  (Doc. 24.)

Smith argues that his constitutional rights were violated when an officer pulled him out of a vehicle to arrest him on November 28, 2018, based on a mistaken belief that he was Jumonta Moore who had an active arrest warrant.  Smith first claims that it was not objectively reasonable for officers to mistakenly believe that he was Moore.  As a remedy for the alleged Fourth Amendment violation, Smith requests suppression of the gun and marijuana that were seized during the interaction, as well as his statements.  Finally, Smith requests that statements he made during an interview nine days later be suppressed as "the unlawful fruit of the unlawful search and seizure. . .on November 28, 2018." (Doc. 36 at p. 1.)

The Government agrees that it will not offer any of the statements Smith made in response to questions by officers on November 28, 2018, as Smith was questioned without the benefit of the *Miranda* warning.  This concession is made with one exception, the

Government intends to offer Smith's spontaneous statement "[m]an, I was gonna smoke that." As to the remainder of Smith's suppression requests, the Government counters that: 1) it was objectively reasonable for the officers to believe that Smith was Jumonta Moore and to attempt to arrest him on a valid arrest warrant, 2) the officers observed the marijuana blunt in plain view making its seizure lawful, 3) the seizure of the firearm from Smith was lawful in that it was reasonable for the officers to conduct a patdown search of Smith, who the officers believed to be Moore, as he was known to be armed and pose a threat to officer safety, and 4) Smith's statements on December 7, 2018 were voluntary and not tainted by the November 28, 2018 interaction.

After an evidentiary hearing, both parties submitted memoranda. (Docs. 36, 37, 38.)

In consideration of the pleadings identified above, as well as the exhibits admitted into evidence, the undersigned recommends that the following findings of fact and conclusions of law be adopted; and that the Defendant's Motion to Suppress be denied.

## I. Findings of Fact

The instant Indictment charges Smith with three counts of possessing a firearm while being an unlawful user of controlled substances. (Doc. 2.) The offenses occurred on November 28, 2018 (Count I); August 9, 2019 (Count II); and March 14, 2020 (Count III). His suppression requests are limited to evidence and statements associated with Count I.

Two police officers designated as Task Force Officers for the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) testified at the suppression hearing: Officer Fahey of the Chicago Police Department (CPD) and Officer Brian Eggers of the Cape Girardeau Police Department (CGPD). Fahey has 18 years of law enforcement experience and Eggers has worked in law enforcement for more than two decades.

In early 2018, Officer Fahey was involved in an investigation related to the interstate transportation of firearms. In part, the investigation revealed that Jumonta Moore, Marcus Ingram, and others were transporting firearms from Missouri to the Chicago, Illinois area for sale. Multiple controlled purchases of firearms were made by a Chicago ATF Confidential Informant during 2018. On November 27, 2018, law enforcement officers secured a Criminal Complaint charging Moore, Ingram, and others with various firearms offenses in the United States District Court for the Northern District of Illinois. *See* Gov't. Ex. #1. Along with the Complaint, an Arrest Warrant was issued for the named defendants.

With the Arrest Warrants for Moore and Ingram in hand, Officer Fahey and ATF Special Agent Bentley travelled to Cape Girardeau, Missouri on November 27, 2018. Local officers assisted with an effort to locate a purple Dodge Challenger that was registered to Moore. Although the officers did not locate the Challenger at the various locations Moore was known to stay, they saw it in Cape Girardeau that evening, but were unable to maintain surveillance of it overnight.

Around 7:00 a.m., on November 28, 2018, officers observed Moore's purple Dodge Challenger at a different location, an apartment building parking lot. Moore was not known to live at the building, however, the purple Challenger with a license plate number registered to Moore, was parked at the apartment complex. It was a distinctive vehicle based on the model, color (purple), and a silver skull sticker that was affixed to the back window. Moore was also known to drive the vehicle. Officers maintained surveillance of the purple Challenger in the parking lot.

Officer Fahey noted that he first became aware of Jumonta Moore during the controlled purchase of a firearm on June 20, 2018. During a later controlled purchase on

November 2, 2018, the individual who delivered a firearm from Missouri to Illinois arrived in a purple Dodge Challenger registered to Moore, but Moore was not present. The operations plan for the arrests on November 28, 2018, included a photograph of Moore and his physical description. Moore was 6'1" tall, slender, and an African American male with more than shoulder length dredlocks.

Shortly after 11:00 a.m., while maintaining surveillance of the Challenger, a slender, black male, who was roughly six feet tall emerged from one of the apartment buildings. The male walked to the Challenger, opened the driver's side door, and entered the vehicle. Surveillance officers were unable to see the man's face, however, believed that the man was Jumonta Moore. Officer Fahey was "pretty confident that it was Jumonta Moore." (Doc.33, Transcript of the Suppression Hearing, hereinafter "Tr.", at p. 42.) Specifically, Officer Fahey's conclusion that Smith was Moore was based on Moore's physical description and Smith's "characteristics [*i.e.*, slender/slim, male, black individual, taller] being similar to Jumonta Moore," as well as Smith "entering Jumonta Moore's vehicle." *Id*. Officer Fahey and Agent Bentley pulled their unmarked ATF vehicle behind the Challenger. Officer Fahey then approached the driver's side of the Challenger, opened the driver's side door, and pulled the driver out of the car.

When Officer Fahey opened the door, he immediately observed a marijuana blunt and lighter in the driver's lap. He pulled the driver out of the car. The blunt and lighter fell to the ground. Officer Fahey placed the man in handcuffs and patted him down as Moore was known to carry firearms. A nine-millimeter handgun was discovered in the driver's waistband. Officer Fahey removed the gun and Agent Bentley secured it. Upon seeing the man's face, Officer Fahey realized the driver was not Moore. The driver identified himself

as Danequay Smith.  Around that time, a local officer, Brian Eggers retrieved the marijuana blunt from the ground where it had fallen and Smith responded, "Man, I was going to smoke that."  The officers asked Smith some questions about Moore's whereabouts, Smith's relationship with Moore, and the marijuana.  Within a few minutes of handcuffing Smith, the handcuffs were removed.  Smith was not arrested for possessing the firearm or the marijuana on that day.

Officer Fahey and Agent Bentley conducted their surveillance approximately 75 feet or more from the apartment building entrance from which Smith emerged.  Smith was walking with his head down and he had some sort of covering on his head that did not allow the officers to see his face or hair.  They could tell he was a black male because his hands were visible.  Officer Fahey described Smith as a tall and slender man.  The Challenger's windows were tinted making it difficult to get a better look at Smith once he entered the car. Both Officer Fahey and Agent Bentley believed Smith was Moore.  Officer Fahey indicated that he would not have gone through with the arrest if he had known Smith was not Moore. Instead, the officers would have followed the Challenger to see if the driver might lead them to Moore.   One week later, on December 5, 2018, Moore was arrested in Sikeston, Missouri.

On December 7, 2018, nine days after Smith was mistakenly arrested, Officer Eggers called Smith to see if he would agree to meet him at the Cape Girardeau Police Department for an interview.  Smith agreed to meet with Eggers.  The two met in an interview room without any witnesses.  Officer Eggers gave Smith the *Miranda* warning and Smith signed a written waiver of his rights.  *See* Gov't Ex. #2.  The interview was recorded.  *See* Gov't Ex. #3.  It lasted less than 18 minutes.  Smith was cooperative and responded to questions appropriately.  He and Officer Eggers talked about Smith's relationship with Moore and

Ingram; and whether Smith knew where or how to find Ingram.  While Moore had been arrested Ingram was not yet in custody.  Smith made incriminating statements about his use of marijuana, as well as how he acquired the firearm.  Smith was not arrested following the interview.

As previously noted, Smith was subsequently found in possession of firearms on August 9, 2019 and March 14, 2020.  The instant Indictment was secured on July 7, 2020.

Smith requests suppression of the gun and marijuana seized from him on November 28, 2018, as well as any statements he made to law enforcement officers on November 28, 2018 and December 7, 2018.

## II.  Conclusions of Law

A police officer may stop and frisk a citizen if the officer has reasonable suspicion, based on articulable facts, that criminal activity is afoot.  *Terry v. Ohio*, 392 U.S. 1, 29-30 (1968).  *See also United States v. Sokolow*, 490 U.S. 1, 7 (1989); *United States v. Woods*, 2014 WL 1282292 at *2 (8th Cir. Apr. 1, 2014), citing *Terry*.  "A reasonable suspicion is a particularized and objective basis for suspecting criminal activity by the person who is stopped."  *United States v. Hightower*, 716 F.3d 1117, 1119-20 (8th Cir. 2013) (quotation omitted).  It requires more than a hunch, but "is considerably less than proof of wrongdoing by a preponderance of the evidence."  *United States v. Sokolow*, 490 U.S. 1, 7 (1989).  All that is needed is "a minimal level of objective justification" for the stop.  *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).

The crux of Smith's argument is that because the officers were not certain Smith was Moore when they pulled Smith out of the Challenger,[1] suppression of all evidence is required. The record supports that it was objectively reasonable for the officers to believe that Smith was Moore. Consequently, no constitutional violation resulted from: 1) Smith being removed from the Challenger to be arrested; 2) the seizure of a marijuana blunt that the officers observed in plain view, 3) Officer Fahey's recovery of a nine millimeter handgun from Smith's waistband during a pat down search, and 4) the interview of Smith on December 7, 2018.

Each of Smith's arguments will be discussed in turn.

## II.A.    Misidentification was Objectively Reasonable

In *Hill v. California*, the Supreme Court determined that if police have probable cause to arrest a person and arresting officers have "a reasonable, good faith belief" that the person they arrested was the person wanted under the arrest warrant, the Constitution is not violated. 401 U.S. 797, 802 (1971). The Supreme Court declined to disturb the California Supreme Court's conclusion below that "[w]hen the police have probable cause to arrest one party, and when they reasonably mistake a second party for the first party, then the arrest of the second party is a valid arrest." *Id.* (quoting the California Supreme Court below, 69 Cal.2d 550, 553). Many years later, the Supreme Court confirmed the holding in *Hill* noting, "if officers with probable cause to arrest a suspect mistakenly arrest an individual matching the

---

[1] Although there was not a traditional traffic stop of the Challenger, the parties appear to agree that the actions of the officers in parking behind the Challenger and pulling Smith out of the car to place him in handcuffs constituted a *Terry* stop. *See United States v. Shields*, 519 F.3d 836, 837 (8th Cir. 2008) (officers were justified in stopping vehicle while "attempting to execute a valid arrest warrant").

suspect's description, neither the seizure nor an accompanying search of the arrestee would be unlawful." *Heien v. North Carolina*, 574 U.S. 54, 61 (2014) (citing *Hill*, 401 U.S. 802-805)). Adding "[t]he limit is that 'mistakes must be those of reasonable men.'" *Id.* (citing *Brinegar*, *supra* at 176).

In *United States v. Smart*, the Eighth Circuit held that "the validity of a stop depends on whether the officer's actions were objectively reasonable in the circumstances, and in mistake cases the question is simply whether the mistake, whether of law or of fact, was an *objectively reasonable* one." 393 F.3d 767, 770 (8th Cir. 2005) (emphasis added). Support for this rule comes from the Supreme Court. "Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability." *Brinegar v. United States*, 338 U.S. 160, 176 (1949).

This case has some similarities to *United States v. Bobo*, 994 F.2d 524 (8th Cir. 1993) wherein Richard Bobo was mistakenly arrested by police officers who believed that Richard was his brother, Marvin Bobo. Marvin was suspected of a murder and there was not yet an arrest warrant for him. "Based on the testimony that the brothers resemble each other, and the fact that Richard was driving Marvin's green Cadillac," the Eighth Circuit found "it was reasonable for [the] Officer [ ] to have assumed that the driver of the car was Marvin." *Id.* at 527. As to whether the mistaken arrest of Richard was lawful, the Eighth Circuit "note[d] that if the police had probable cause to arrest Marvin, and they reasonably believed that the man driving the green Cadillac was Marvin, then Richard's arrest was a valid arrest." *Id.* at

527 (citing *Hill*, 401 U.S. at 802). If there had been a valid arrest warrant for Richard Bobo, as there was for Moore in the instant case, such analysis would not have been necessary.

The parties' analyses of *Kent* and *Rose* is not helpful in that those cases did not involve officers mistaking the wrong person for someone who was wanted on an arrest warrant. *See United States v. Kent*, 531 F.3d 642, 647 (8th Cir. 2008) (Ten factors, including tip of unproven informant, supported officer's reasonable suspicion that Kent, who was wanted, was involved in criminal activity.); and *United States v. Rose*, 731 F.2d 1337 (8th Cir. 1984) (officers had reasonable suspicion to stop a yellow Camaro following a robbery). The officers in the instant case did not need reasonable suspicion to approach Smith because they believed he was Moore for whom they had a valid arrest warrant.

Smith argues that it was not reasonable for the officers to believe that Smith was Moore because Officer Fahey testified that he and Officer Bentley were uncertain as to whether the man getting into the Challenger was in fact Moore. Specifically, Smith claims that the officers never identified Smith as Moore. Smith suggests that "[i]t is unreasonable to make a positive identification of an individual without ever seeing their facial features." (Doc. 36 at p. 5.) He argues that the officers could not say that he resembled Moore like the officer in *Bobo*, *supra*, because they could not see his face. Officer Fahey did not have a good look at Smith's face because Smith was walking with his face down, had some sort of covering on his head, and the Challenger's windows were tinted. The physical characteristics that Officer Fahey relied on included that Smith was a "slender, male black individual, taller." (Tr. 42.) In addition to Smith's physical appearance, Officer Fahey viewed the fact Smith got into the driver's seat of Moore's Challenger as a "big factor" in his belief that Smith was Moore. (Tr. 43.)

While Moore was the owner of the purple Challenger, the officers knew a different individual had been observed driving the vehicle on one prior occasion. Smith claims that "[t]he vehicle cannot be used as the driving force for identification because it is irrelevant to a person's appearance." *Id*. Next, Smith argues that the officers who arrested him failed to exactly match his age and physical description to that of Moore, "such as hair length, hair color, and all facial features." *Id*. at 6.

A similar argument was made in *United States v. Phillips*, No. 11-CR-27-LRR, 2011 WL 1790127 (N.D. Ia. May 10, 2011) (unpublished) wherein officers mistakenly believed that Tony Phillips (referred to below as Defendant) was Gregory Hollie, an individual with an outstanding arrest warrant. The facts underlying the mistaken arrest were described by the District Court as follows:

> While performing surveillance on a house where Hollie was known to stay, officers observed Defendant walk down the street and approach the house. After repositioning their vehicle, officers saw a vehicle pull into a parking area in the rear of the house. When the vehicle exited the alley behind the home, officers observed Defendant in the back seat. Officers believed Defendant was the same individual they had just seen walking in front of the house. Based on a booking photo and physical description of Hollie, Officer O'Brien testified that he and his partner believed Defendant was Gregory Hollie.

*Id*. at *2. These underlying facts are different than the instant case in that Defendant entered and exited a house that was associated with Hollie. The officers had seen Hollie's booking photo and knew he was a black male, mid-thirties, six feet tall, 215 pounds, and bald. *United States v. Phillips*, 679 F.3d 995, 996 (8th Cir. 2012). Significantly, the arresting officers were unable to positively identify Defendant as Hollie before they stopped the vehicle Defendant entered after exiting a house where Hollie was known to stay. All the officers

could see was a bald head in the backseat of the car.  Once the vehicle was stopped, the officers asked Defendant to exit the vehicle, patted him down, and then confirmed his identity.  Defendant was a six-foot, 200-pound, 38-year-old, bald, black male.  "Given the totality of the circumstances," the Eighth Circuit found that the officer's "mistaken belief that [Defendant] was Hollie was objectively reasonable." *United States v. Phillips*, 679 F.3d 995, 998 (8th Cir. 2012).  Moore's purple Challenger is much like the house where Hollie was known to stay.  It is a factor in addition to a physical description that makes the officers' mistaken belief as to Smith's identity objectively reasonable.

Smith's argument that officers must make a positive identification before an arrest can be made is unworkable.  Such a rule would brand as illegal the execution of any arrest warrant wherein, due to a mistake in fact, the person arrested wound up being someone other than the individual the officers intended to arrest.  The Eighth Circuit "do[es] not require absolute certainty of identity before an arrest can be made, because 'there can always be more investigation to verify identity.'" *United States v. Patrick*, 776 F.3d 951, 956 (8th Cir. 2015) (quoting *Hill v. Scott*, 349 F.3d 1068, 1074 (8th Cir. 2003) (Civil rights case wherein Plaintiff Hill was mistakenly arrested as another person who had the same first and last name.)).

*Patrick* involved an ATF Agent's reliance on a known informant's mistaken identification of Broderick Patrick as Broderick Barefield for whom there was a Federal Complaint and Arrest Warrant.  The informant arranged a meeting with a person he believed was Barefield at a McDonald's parking lot.  He reported Barefield would arrive in a gold Oldsmobile with a dented passenger-side door and that a plastic water bottle containing drugs would be in the car.  A car matching that description, although a Buick, arrived at the

appointed time.  The driver interacted with the informant.  When the car exited the parking

lot, officers were unable to positively identify the driver as Barefield.  The police officer

tasked with stopping the Buick had not seen a picture of Barefield.  He was told the driver of

a gold vehicle with a dent would be an African American male with an outstanding arrest

warrant, and that he was likely armed.  The driver did not have an identification card and

falsely claimed he was *Andre* Patrick when in fact he was *Broderick* Patrick.  Under these

circumstances and after referencing *Hill v. California*, the Eighth Circuit in *Patrick*

concluded "[f]ully aware that 'aliases and false identifications are not uncommon,' *id*. at 803

[ ], and that even if genuine, Barefield's driver's license photos could differ greatly from his

appearance in person (especially if his braided hairstyle had been altered since the time of the

photo), the officers under the circumstances were not unreasonable in suspecting Patrick

probably was Barefield."  776 F.3d at 956 (quoting *Hill*, 401 U.S. at 803).

The ultimate question is whether it was objectively reasonable for the officers to

believe that Smith--who they described as a tall, slender, black male and who they watched

unlock and enter the purple Challenger registered to Moore--was Moore.  While it's not

directly evident from the record, Smith suggests that his facial features, skin tone, and hair

were different from Moore.  The officers believed that Smith's physical height and build

matched Moore's height and build; they were able to identify Smith as an African American

male; and Smith entered Moore's Challenger after apparently spending the night at the

apartment complex.  As noted in *Hill*, "sufficient probability, not certainty, is the touchstone

of reasonableness under the Fourth Amendment…"  401 U.S. at 804.  Officer Fahey testified

that if he and Agent Bentley had recognized Smith was not Moore, they would not have tried

to arrest the wrong person rather they would have followed Smith to see if he might lead

them to Moore.  The purple Challenger registered to Moore was a unique vehicle. The person who the officers observed unlocking and entering Moore's vehicle was the same race as Moore and the officers perceived him as being tall and slender like Moore, although the person's facial features and age were not apparent.  Once the officers determined that Smith was not Moore, they seized the marijuana blunt that fell from Smith's lap, secured the weapon that was found in his waistband, and asked what Smith knew about Moore's whereabouts.  Smith was released shortly after he was arrested.

Under the totality of the circumstances before the officers, Smith's arrest was a reasonable response to the situation facing them at the time.  The record of the case supports that it was objectively reasonable for the officers to believe the man who entered the purple Challenger was Moore.

The officer's mistaken arrest of Smith did not violate the Fourth Amendment.

## II.B.   Patdown Search and Detention were Lawful

Next, the undersigned will address Smith's claims that the physical evidence seized on November 28, 2018 (*i.e.*, marijuana blunt that fell from his lap and the gun found in his waistband) should be suppressed.

"When a person commits a crime in the presence of [an] officer, that conduct gives the officer probable cause—a higher standard than reasonable, articulable suspicion---to seize the person." *United States v. Banks*, 553 F.3d 1101, 1104 (8th Cir. 2009) (citing *United States v. Lewis*, 183 F.3d 791, 794 (8th Cir. 1999) (describing the rule as "well-established")); (other citation omitted).  When a valid traffic stop places officers in close proximity to a vehicle from which location they can see contraband in plain view, seizure is lawful. *Horton v. California*, 496 U.S. 128, 130 (1990). *See also United States v. Gillon*,

348 F.3d 755, 759 (8th Cir. 2003) (approving warrantless seizure of bags of cocaine in plain view during valid traffic stop).

Moreover, if the officer reasonably believes the person with whom he is dealing is armed and dangerous, he is permitted to conduct a protective search of the person's outer clothing, and any weapons seized as a result of such a search "may be properly introduced into evidence against the person from whom they were taken." *United States v. Cotter*, 701 F.3d 544, 547 (8th Cir. 2012) (quoting *Terry*, 392 U.S. at 30-31). An "officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man under the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27.

"During an investigative stop, officers should use 'the least intrusive means of detention and investigation, in terms of scope and duration, that are reasonably necessary to achieve the purpose' of the temporary seizure." *United States v. Maltais*, 403 F.3d 550, 556 (8th Cir. 2005) (quoting *United States v. Navarrete-Barron*, 192 F.3d 786, 790 (8th Cir. 1999). During a *Terry* stop, officers are "authorized to 'take such steps as [a]re reasonably necessary to protect [their] personal safety and to maintain the status quo during the course of the stop." *Id*. (quoting *United States v. Hensley*, 469 U.S. 221, 235 (1985)). The Eighth Circuit has previously held that use of handcuffs can be a reasonable precaution during a *Terry* stop to protect their safety and maintain the status quo." *United States v. Martinez*, 462 F.3d 903, 907 (8th Cir. 2006) (citations omitted).

In *United States v. Shields*, 519 F.3d 836 (8th Cir. 2008), the United States Marshals had a fugitive warrant for Brian Shields. They believed he was in the Little Rock area and driving a tan truck. In addition to having that information and an arrest warrant, they

received a tip that Brian Shields was driving the tan truck with a passenger in it.  The

Marshals located the truck and stopped it.  The deputy who approached the vehicle asked the

driver to exit the truck.  When the driver did so, the deputy recognized the driver as Brian

Shield's brother, Christopher.  The passenger was not Brian, rather a woman and child.

Based on prior interactions, the deputy knew Christopher Shields (the driver) had a

suspended driver's license.  The driver (Christopher) was placed in handcuffs and patted

down.  Another officer observed crack cocaine resting unconcealed on a dashboard

cupholder.  The Eighth Circuit concluded "[i]t was the stop itself rather than the detention

that created the opportunity for the second deputy to see the contraband." *Id*. 837.  Adding

that "[n]one of our precedent regarding vehicle stops and searches prevents an officer from

looking into a vehicle through windows or open doors as a routine step at the institution of a

valid traffic stop." *Id*.  at 837-38.

      In this case, the officers believed that Moore was likely to be armed and dangerous.

Officer Fahey pulled the driver out of the vehicle and immediately placed him in handcuffs

so that he could perform a patdown search.  That search resulted in the discovery of a

handgun.  Once the officer safety concerns were resolved, the officers realized that Smith

was not Moore.  Although the officers had the wrong man in custody, they still had to deal

with the marijuana that was observed in Smith's lap and then fell to the ground when Smith

was removed from the vehicle.  Smith's possession of marijuana was a violation of law and

provided a basis for the officers to further investigate.  In that Smith was in control of

Moore's vehicle, it was also reasonable for them to inquire as to whether Smith knew of

Moore's whereabouts as they still needed to execute the arrest warrant.  Within a few

minutes of Smith being pulled from the vehicle and handcuffed, the handcuffs were removed. Furthermore, Smith was not arrested.

As to Smith's request for his handgun to be suppressed, the officers knew Moore had been engaged in transporting firearms across state lines and that he was known to carry firearms. The patdown resulted in Officer Fahey finding a nine-millimeter handgun in Smith's waistband. Officer Fahey's actions of handcuffing and patting Smith down were reasonably necessary to protect his safety and the other officers based on what he knew at the time. The officers observed the marijuana blunt in plain view as it was initially on Smith's lap and then fell to the ground. The totality of the circumstances supports the seizure of the gun and marijuana as evidence. Thus, suppression of the items is not warranted.

## II.C.   Volunteered Statement is Admissible

Having concluded that the arrest of Smith was objectively reasonable, the patdown search was reasonably necessary, and that his further detention was warranted based on the marijuana blunt being observed in plain view, the next question is whether Smith's spontaneous statement regarding what he intended to do with the marijuana blunt should be suppressed. The Government has conceded that the other statements made by Smith on November 28, 2018 are inadmissible as they were not preceded by the *Miranda* warning.

As the Supreme Court has explained, not all statements obtained by the police after a person is in custody are the result of interrogation. *See Rhode Island v. Innis*, 446 U.S. 291, 299 (1980). *Miranda v. Arizona* clarified that "[v]olunteered statements of any kind are not barred by the Fifth Amendment. . ." 384 U.S. 436, 478 (1966). "[T]he special procedural safeguards in *Miranda* are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation. 'Interrogation,' as

conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." *Innis*, 446 U.S. at 300.

The Eighth Circuit has repeatedly held that "[v]oluntary statements unprompted by interrogation are admissible with or without *Miranda* warnings." *United States v. Bailey*, 831 F.3d 1035, 1038 (8th Cir. 2016), citing *United States v. McGlothen*, 556 F.3d 698, 701 (8th Cir. 2009). *See also United States v. Turner*, 157 F.3d 552, 556 (8th Cir. 1998).

Smith's revelation that he planned to smoke the marijuana blunt was not in response to any question or interrogation by law enforcement. It was a volunteered statement. As such, Smith's statement, "Man, I was going to smoke that," should not be suppressed.

## II.D.  Statements Made Nine Days after Mistaken Identification are Admissible

Smith argues that the statements he made on December 7, 2018 are fruit of the poisonous tree because the interview on that day "was the direct result of the unlawful seizure of [him] on November 28, 2018," and Officer Fahey's mistaken identification of him was not reasonable. (Doc. 36 at pp. 8-9.)

"[T]he exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'" *United States v. Riesselman*, 646 F.3d 1072, 1078 (8th Cir. 2011) (quoting *Segura v. United States*, 468 U.S. 796, 804 (1984)). In addition, "[v]erbal statements obtained as a result of a Fourth Amendment violation are as much subject to the exclusionary rule as are items of physical evidence discovered during an illegal search." *United States v. Yousif*, 308 F.3d 820, 832 (8th Cir. 2002) (citing *Wong Sun v. United States*, 371 U.S. 471, 485 (1963)). "[T]he defendant bears the initial burden of

establishing the factual nexus between the constitutional violation and the challenged evidence." *United States v. Marasco*, 487 F.3d 543, 547 (8th Cir. 2007).

In this case, because the mistaken arrest of Smith was objectively reasonable, none of his statements that were made on December 7, 2018 constitute fruit of the poisonous tree. *See United States v. Goodale*, 738 F.3d 917, 922 (8th Cir. 2013). Smith did not argue that the statements he made that day were involuntary or that there was a violation of *Miranda v. Arizona*, 384 U.S. 436, 448-450 (1966), so those issues are not considered.

Smith's request for suppression of his statements should be denied.

Further, even if the mistaken identification of Smith as Moore was not objectively reasonable, the statements Smith made on December 7, 2018 are admissible under the attenuation doctrine. When a factual nexus is made between a constitutional violation and challenged evidence, *United States v. Yorgensen* instructs that a determination must be made as to whether the attenuation doctrine applies. 845 F.3d at 914 (8th Cir. 2017) (citation omitted). "[T]o determine whether the causal connection between incriminating statements and an arrest or search that violated the Fourth Amendment has been broken" four factors must be considered. *Id*. The four factors, include: 1) whether the *Miranda* warning was given, 2) the temporal proximity of the unconstitutional conduct and the statements, 3) the "presence of intervening circumstances," and 4) "particularly, the purpose and flagrancy of the official misconduct." *Id*. (citing *Brown*, 422 U.S. at 603-04; *Riesselman*, 646 F.3d at 1080).

Smith claims there were no intervening circumstances between November 28 and December 7. Smith further complains that although Officer Eggers gave him the *Miranda* warning, Officer Eggers did not advise Smith that he was the subject of a Federal

investigation. (Doc. 24 at p. 7.) He also claims Officer Fahey's conduct in mistaking Smith

for Moore was purposeful and that he should have known that "you cannot make a positive

identification of an individual based solely on their body type." (Doc. 36 at p. 9.) Smith

argues that Officer Fahey should have known that his act of opening the car door to identify

him was unlawful and improper conduct. *Id.*

 As to the first factor, Officer Eggers advised Smith of the *Miranda* warning. He

explained, "because we're going to be talking about criminal activity, I'm going to go ahead

and advise you of your rights. You're not being charged with anything right now. Ummm--

just in case the conversation goes into something like that, just so you understand that."

(Gov't. Ex. #3 at 01:12-01:25.) Officer Eggers read the *Miranda* warnings to Smith and

Smith signed the *Miranda* waiver form. *See* Gov't. Ex. #2. Smith willingly participated in

the interview by meeting with Officer Eggers at his request. In reviewing the recording it

appears the purpose of the interview was threefold: 1) to learn more about Smith's

relationship with Moore who Smith knew had been arrested two days earlier, 2) to see if

Smith could help locate Ingram, and 3) to inquire about Smith's possession of the marijuana

and gun. Smith explained that he agreed to talk to Officer Eggers because he wanted to clear

up his connection with the wanted subjects, and because he understood there might be

consequences for having the gun since it belonged to him. (Gov't. Ex. #3 at 14:23-14:38.)

Smith also noted that his father encouraged the interview so they would know whether Smith

was going to be arrested; and "if everything's cool, he trying to put me on a whole different

route." *Id*. at 16:06-16:18. Officer Eggers encouraged Smith to not allow the subjects they

discussed to stay at his house. At the time of the interview, it did not appear that Officer

Eggers' intent was to build a case against Smith. That assessment is supported by the fact

that it was not until Smith was found in possession of two additional firearms on August 19, 2019 and March 14, 2020, that the instant Indictment was sought and secured in August of 2020.  This factor weighs against suppression.

In considering the temporal proximity of the interview, nine days passed between the mistaken arrest of Smith and Smith's agreement to meet with Officer Eggers for an interview.  The nine days gave Smith plenty of time to contemplate his situation.  He knew that the officers had seized marijuana and a gun from him and that he could potentially face criminal charges.  Smith was not a stranger to law enforcement in that, less than six weeks earlier, he was arrested following a highspeed chase with law enforcement officers in Kansas.  The Kansas officer seized marijuana at the end of the pursuit, Smith was charged with possessing the marijuana, and released on bond.  *See* Doc. 24-1.  This factor weighs against suppression.

The third factor requires consideration of whether there were intervening circumstances between the mistaken arrest and interview.  A significant circumstance is the fact that Smith was released once the officers discovered he was not Moore.  Additionally, before meeting with Officer Eggers, Smith knew Moore was arrested in a nearby town and that Ingram was still wanted on the outstanding Federal Warrant.  The interview also took place at a different location than where the mistaken arrest occurred, although it was conducted by one of the officers who was present and who asked Smith questions on that day.  The voluntary nature of the interview is supported by the fact that Smith refused to tell Officer Eggers the identity of the person from whom he purchased the nine-millimeter handgun that was seized from him on November 28, 2018.  He also declined an invitation to assist Officer Eggers in locating Ingram.  This factor weighs against suppression.

Finally, assuming for the sake of argument that it was unreasonable for the officers to believe that Smith was Moore, that conclusion was not flagrant and there was no improper purpose behind the misidentification.  Once the officers discovered their mistake and resolved a few questions, Smith was released.  This conduct "is a far cry from the purposeful and flagrant misconduct that weighed in favor of suppression in Brown and its progeny." *Id*. at 916.  Officer Fahey testified that he was "pretty confident" that Smith was Moore and that if they had believed Smith was not Moore, they would have simply followed Smith in the Challenger to see if he might lead them to Moore.  This factor weighs against suppression.

All four of the *Brown* factors weigh in favor of applying the attenuation doctrine as "the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'"  *Utah v. Strieff*, __ U.S. __, 136 S.Ct. 2056, 2061 (2016) (citing *Hudson v. Michigan*, 547 U.S. 586, 593 (2006).

Smith's request for suppression of the statements he made during the December 7, 2018 interview should be denied.

### III.  Conclusion

In accordance with the Memorandum above,

**IT IS HEREBY RECOMMENDED** that in consideration of the Government's concession that Smith's statements on November 28, 2018 should be suppressed with the exception of his volunteered statement related to the marijuana, the Defendant's request for the suppression of his November 28, 2018 statements except for his statement, "Man, I was going to smoke that," is **granted**.

**IT IS FURTHER RECOMMENDED** that in all other respects, the Defendant's Motion to Suppress (Doc. 24) be **denied**.

Further, the parties are advised that they have until not later than April 9, 2021, in which to file written objections to this Report and Recommendation, unless an extension of time for good cause is obtained.  Failure to file timely objections may result in a waiver of the right to appeal questions of fact.  *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

/s/ *Abbie Crites-Leoni*
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 26th day of March, 2021.